**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| IN RE SENSATA TECHNOLOGIES DATA BREACH LITIGATION | No. 1:25-cv-11726-JEK<br>Consolidated with:<br>1:25-cv-11698<br>1:25-cv-11735<br>1:25-cv-11736<br>1:25-cv-11790 |

**MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

**KOBICK, J.**

Plaintiffs Paul Heine, Jose Islas, James Lackner, Donald Ryng, Franklin Wloch, and John Baptist bring this putative class action lawsuit alleging that their former employer, defendant Sensata Technologies, Inc., failed to safeguard their private data, resulting in a data breach that compromised their private information and caused them various forms of harm. The operative complaint asserts claims for negligence, breach of contract, unjust enrichment, declaratory judgment, and for violations of the California Unfair Competition Law, California Consumer Privacy Act, California Consumer Records Act, and Massachusetts Consumer Protection Act, M.G.L. c. 93A. Pending before the Court is Sensata's motion to dismiss for lack of standing and for failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

For the reasons that follow, that motion will be granted in part and denied in part. The plaintiffs have standing to pursue monetary and equitable relief because they have sufficiently alleged that Sensata's conduct led to the material risk of the future misuse of their data and a separate concrete injury caused by their exposure to that risk. They have alleged plausible claims for negligence, breach of an implied contract, unjust enrichment, and for violations of California's Consumer Privacy Act, Consumer Records Act, and Unfair Competition law. Those claims will

proceed to discovery. The plaintiffs' claims for violations of Chapter 93A and the Declaratory Judgment Act will, however, be dismissed.

**BACKGROUND**

The following facts, recounted based on the allegations in the consolidated class action complaint, ECF 13,[1] and documents attached to or sufficiently referenced therein, are assumed true for purposes of the motion to dismiss.

Plaintiffs Heine, Islas, Lackner, Ryng, Wloch, and Baptist are former employees of Sensata. ECF 13, ¶¶ 134, 149, 165, 180, 195, 210. They are citizens of Minnesota, California, Arizona, Rhode Island, Michigan, and Massachusetts, respectively. *Id.* at 4, ¶¶ 13-18. Sensata is a corporation and global industrial technology company that designs, customizes, and manufactures "mission-critical sensors and controls." *Id.* at 2, ¶ 2. As a condition of obtaining their employment, participating in Sensata's health plan, or for other business-related reasons, the plaintiffs were required to, and did, entrust Sensata with sensitive personal information. *Id.* at 5, ¶ 26. This information included their names, addresses, Social Security numbers, dates of birth, tax identification numbers, driver's license numbers or state-issued identification card numbers, passport numbers, other government-issued identification numbers, financial account information, payment card information, medical information, and health insurance information (together, their "Private Information"). *Id.* Sensata collected and stored this Private Information in its computer systems. *Id.* at 5-6, ¶ 26.

[1] Due to an apparent formatting error in the operative complaint resulting in duplicative paragraph numbers, citations to paragraphs from pages 1-9 of that pleading will include page numbers and paragraph numbers. For citations to the consolidated complaint from pages 10 to 77, page numbers will be omitted.

## I. The Data Breach.

On April 6, 2025, Sensata determined that certain servers in its network were encrypted with ransomware. *Id.* at 9, ¶ 38. An investigation into the matter revealed that there was unauthorized activity in the network between March 28, 2025 and April 6, 2025 and that "an unauthorized actor viewed and obtained files" during that time. *Id.* The attacker accessed and acquired files that "may have included" unencrypted Private Information, including the plaintiffs' "name[s], address[es], and one or more of the following data elements: Social Security number[s], tax identification number[s], driver's license number[s] or state-issued identification card number[s], passport number[s], other government-issued identification number[s], financial account information, payment card information, medical information, health insurance information, and/or date[s] of birth." *Id.* at 9, ¶ 38; *id.* ¶ 25. On the same day that Sensata discovered the breach (hereinafter the "Data Breach"), it filed an 8-K form with the Securities and Exchange Commission "announcing that it had experienced a cybersecurity incident in which there was 'evidence that files were taken from the Company's environment'" and that "'the full scope and impact of [the] incident is not yet known.'" *Id.* ¶ 23.

On June 5, 2025, following its review of the implicated files, Sensata began notifying the plaintiffs about the Data Breach. Individuals whose Private Information was implicated received a "Notice of Data Breach letter" (the "Notice") informing them that their Private Information may have been involved. *Id.* at 9-10, ¶ 38. The Notice further explained that Sensata had arranged for impacted individuals "to receive one year of complimentary access to Experian Identity Works$^{SM}$ credit monitoring" and that Sensata had "taken additional steps to enhance [its] existing security measures." *Id.* at 10, ¶ 38. Absent from the Notice was any information about "whether [Sensata]

was able to contain or end the cybersecurity threat," "whether it paid a ransom to obtain the return or destruction of exfiltrated Private Information," or "how the breach itself occurred." *Id.* ¶ 22.

According to the plaintiffs, the Data Breach occurred because Sensata, among other things, "did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining" and "failed to implement industry-standard cybercity measures." *Id.* ¶¶ 24, 86. Specifically, the plaintiffs allege that Sensata failed to encrypt its network or delete Private Information when it was no longer needed, *id.* ¶ 24, and devoted insufficient resources to "encrypting sensitive personal data, preventing external access, detecting outside infiltration, and training its employees to identify hacking threats and defend against them," *id.* ¶ 88. Nor did Sensata protect its network with "sufficient multi-layer data security technologies or effective firewalls" or establish "sufficiently effective endpoint detection." *Id.* ¶¶ 89-90.

## II. <u>Consequences of the Data Breach.</u>

Each of the six plaintiffs provided their Private Information to Sensata as a condition of their employment and participation in Sensata's health plan, and each received the Notice alerting them that the Data Breach potentially implicated their data. *Id.* ¶¶ 134-137, 149-152, 165-168, 180-183, 185, 195-198, 200, 210-213, 215. The plaintiffs are "very careful about sharing [their] sensitive Private Information"; they "stor[e] any documents containing [their] Private Information in a safe and secure location"; and they have "never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source." *Id.* ¶¶ 138, 153, 169, 184, 199, 214. In response to the Data Breach, each "made reasonable efforts to mitigate [its] impact," including by changing their passwords, contacting credit bureaus, and monitoring their financial accounts—efforts that took "significant time . . . [they] otherwise would have spent on other activities, including but not limited to work and/or recreation." *Id.* ¶¶ 141, 156, 172, 187, 202, 217.

In undertaking this monitoring, Islas "noticed suspicious activity on his credit report." *Id.* ¶ 157. Following the Data Breach, each plaintiff also began experiencing "an increase in spam calls, texts and emails." *Id.* ¶¶ 142, 158, 173, 188, 203, 218. For Lackner, these included "calls from individuals purporting to be debt collectors" even though he owes no debt, and "emails soliciting [his] financial information with statements such as 'we cannot renew your account without a new credit card number' and 'we are going to delete your account.'" *Id.* ¶ 173.

Concerned for their personal financial security and uncertain about what medical information was stolen in the Data Breach, each plaintiff is suffering from "anxiety, sleep disruption, stress, and fear." *Id.* ¶¶ 143, 159, 174, 189, 204, 219. Notwithstanding the complimentary year of credit monitoring provided by Sensata, the plaintiffs "anticipat[e] spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach." *Id.* ¶¶ 144, 160, 175, 190, 205, 220. They also allege that "[f]uture identity theft monitoring" services will be "necessary" and will cost them approximately $200 each per year "for a minimum of five years." *Id.* ¶ 132.

## III. <u>Sensata's Data Privacy Policies and Code of Conduct.</u>

Sensata maintains a Code of Business Conduct and Ethics that, among other things, emphasizes the protection of confidential information and intellectual property. *Id.* at 6, ¶ 29. The Code states that Sensata "follow[s] all [c]ompany policies for protecting [the confidential information of [its] employees, customers, and third parties] against theft or misuse by others" and is "in compliance with applicable privacy and data protection laws." *Id.* The Code further states that Sensata "always . . . [p]rotect[s] personal information from loss, misuse, or disclosure." *Id.* at 6-7, ¶ 29.

Sensata's Recruitment Privacy Policy similarly assures applicants and future employees that "Sensata Technologies takes [their] privacy seriously" and "explains how and why Sensata collects, processes and protects [their] personal data as a data controller during and after the recruitment process." *Id.* at 7, ¶ 30. Specifically, the Recruitment Privacy Policy says that Sensata "implement[s] technical and organizational measures to ensure a level of security appropriate to the risk to the personal data [it] process[es]" and that those "measures are aimed at ensuring the on-going integrity and confidentiality of personal data." *Id.*

Sensata's global Privacy Policy likewise addresses the company's approach to data security. It states, among other things, that Sensata "is committed to respecting your privacy" and "retain[s] your information for as long as is necessary to accomplish the purpose for which it was collected." *Id.* at 7-8, ¶ 31. It further represents that Sensata "implement[s] a range of technical and organisational measures designed to provide a level of security appropriate to the risk to the personal information [it] process[es], including to address the on-going integrity, confidentiality, and availability of personal information," and that those measures are "evaluate[d] . . . on a regular basis." *Id.*

**IV. <u>Procedural History.</u>**

Lackner, Islas, Ryng, Wloch, and Heine initially brought separate lawsuits against Sensata in June 2025, each asserting claims on behalf of themselves and those similarly situated. After the Court granted their motion to consolidate, those plaintiffs and Baptist filed a consolidated class action complaint against Sensata on October 2, 2025, seeking damages, restitution, various injunctions, and a declaratory judgment. ECF 13. The complaint proposes three sub-classes of individuals whose Private Information was compromised in the data breach, including those who received the Notice from Sensata: (1) a Nationwide Class, (2) a California Subclass, and (3) a

Massachusetts Subclass. ECF 13, ¶ 225. On behalf of all plaintiffs, the complaint asserts common law claims of negligence (Count I), breach of implied contract (Counts II), and unjust enrichment (Count III), as well as a statutory claim for a violation of Massachusetts' Consumer Protection Act, M.G.L. c. 93A (Count VII). The complaint also requests a declaratory judgment (Count VIII). On behalf of Islas, the complaint alleges violations of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* (Count IV); Consumer Privacy Act, Cal. Civ. Code § 1798.150 *et seq.* (Count V); and Consumer Records Act, Cal. Civ. Code § 1798.80 *et seq.* (Count VI).

In February 2026, Sensata moved to dismiss the consolidated complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that the plaintiffs lack standing to assert their claims and otherwise fail to state cognizable claims for relief. ECF 22. After the plaintiffs filed their opposition and Sensata replied, the Court held a hearing and took the motion under advisement. ECF 25, 26, 28. With leave of the Court, the parties submitted supplemental briefs concerning the appropriate choice of law for the plaintiffs' common law claims. ECF 28, 29, 30.

## STANDARD OF REVIEW

In evaluating a motion to dismiss under Rule 12(b)(6), the Court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintif[f], the complaint states a claim for which relief can be granted." *Cortés-Ramos v. Martin-Morales*, 956 F.3d 36, 41 (1st Cir. 2020) (quotation marks omitted). The complaint must allege "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 559 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* at 679.

A motion to dismiss under Rule 12(b)(1) that contests subject matter jurisdiction is reviewed under "essentially the same [standard] as a Rule 12(b)(6) analysis." *Cebollero-Bertran v. Puerto Rico Aqueduct & Sewer Auth.*, 4 F.4th 63, 69 (1st Cir. 2021). "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Johansen v. United States*, 506 F.3d 65, 68 (1st Cir. 2007) (quotation marks omitted). The Court "must credit the plaintiff's well-pled factual allegations and draw all reasonable inferences in the plaintiff's favor" to determine whether the complaint plausibly alleges a basis for jurisdiction. *Merlonghi v. United States*, 620 F.3d 50, 54 (1st Cir. 2010).

## DISCUSSION

### I. <u>Standing.</u>

Sensata challenges the plaintiffs' standing to bring their claims in federal court. To invoke a federal court's jurisdiction under Article III of the U.S. Constitution, plaintiffs must demonstrate that (1) they suffered an injury in fact that is concrete, particularized, and actual or imminent; (2) there is a sufficiently direct causal connection between the challenged action and the identified harm; and (3) the injury would likely be redressed by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021); *In re Evenflo Co., Mktg., Sales Pracs. & Prods. Liab. Litig.*, 54 F.4th 28, 34 (1st Cir. 2022). Where, as here, plaintiffs seek damages and equitable relief, they "'must demonstrate standing . . . for each form of relief they seek.'" *In re Evenflo*, 54 F.4th at 34 (quoting *TransUnion*, 594 U.S. at 431).[2]

[2] The claims asserted in the complaint all arise from the alleged Data Breach, and neither party argues that the standing inquiry differs with respect to any claim. Accordingly, the Court will "treat the claims together throughout [its] analysis." *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 373 n.3 (1st Cir. 2023).

The plaintiffs advance multiple theories of how they have been harmed by the Data Breach. They claim (1) the actual misuse of their Private Information; (2) a material risk of future misuse of their Private Information; and (3) a diminution in the value of their Private Information. Based on these theories of harm, the plaintiffs seek damages, restitution, a declaratory judgment, and various forms of injunctive relief. The Court will consider whether each theory plausibly alleges an injury in fact traceable to Sensata's conduct before determining if the relief sought may redress those harms.

A. Injury in Fact and Traceability.

The plaintiffs must first make a threshold showing of an injury in fact. Such an injury "must be both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 731 (1st Cir. 2016) (quotation marks omitted). In determining whether a plaintiff has suffered a concrete harm, "courts should assess whether the alleged injury . . . has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for lawsuit in American courts." *TransUnion*, 594 U.S. at 424 (quoting *Spokeo v. Robins*, 578 U.S. 330, 341 (2016)). "This 'inquiry asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury,' but 'does not require an exact duplicate.'" *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023) (quoting *TransUnion*, 594 U.S. at 424-25). Though "[t]he most obvious are traditional tangible harms, such as physical harms and monetary harms[,] . . . [v]arious intangible harms can also be concrete," including "reputational harms, disclosure of private information, and intrusion upon seclusion." *TransUnion*, 594 U.S. at 425. Once the plaintiffs have established an injury in fact, they must adequately allege traceability—i.e., that "the asserted injury is causally connected to the challenged conduct." *Pagán*

*v. Calderón*, 448 F.3d 16, 27 (1st Cir. 2006); *see Santos-Pagán v. Bayamon Med. Ctr.*, 178 F.4th 66, 71-73 (1st Cir. 2026).

1. *Actual Misuse.*

The plaintiffs first allege that, after the Data Breach, they experienced actual misuse of their data in the form "an increase in spam calls, texts and emails," including fraudulent "calls from individuals purporting to be debt collectors" and "emails soliciting financial information." ECF 13, ¶¶ 142, 158, 173, 188, 203, 218. They argue, and the Court agrees, that such unwanted communications satisfy the injury-in-fact requirement for Article III standing. The First Circuit made clear in *Webb v. Injured Workers Pharmacy*, *LLC* that the "actual misuse of a plaintiff's [Private Information] resulting from a data breach" constitutes a concrete injury. 72 F.4th at 374. Although the "actual misuse" in *Webb* consisted of the use of the plaintiff's Private Information to file a fraudulent tax return, this Court has held that the use of Private Information to conduct scamming and phishing outreach also constitutes the concrete harm of "actual misuse." *See, e.g.*, *Scifo v. Alvaria, Inc.*, No. 23-cv-10999-ADB, 2024 WL 4252694, at *3 (D. Mass. Sept. 20, 2024). Similarly, in assessing standing to assert Telephone Consumer Protection Act claims, Courts of Appeals widely hold that unwanted phone calls and text messages constitute a concrete injury because they "are among the privacy intrusions that give rise to liability" for the common law tort of "intrusion upon seclusion." *Drazen v. Pinto*, 74 F.4th 1336, 1344-45 (11th Cir. 2023); *accord Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020); *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (9th Cir. 2017).

Sensata contends that the plaintiffs have nevertheless failed to adequately allege that the unwanted text messages and phone calls are traceable to its conduct. To demonstrate traceability, the plaintiffs must "plausibly allege a connection between the data breach and the [actual misuse]."

*Webb*, 72 F.4th at 373. The First Circuit held that such a connection was adequately pled in *Webb* because the plaintiff alleged that (1) her private information, including her social security number, had been breached; (2) she was otherwise "very careful" about sharing and storing that private information; (3) her private information was used to file a fraudulent tax return; and (4) there was "an obvious temporal connection between the [actual misuse] and the timing of the data breach." *Id.* at 370, 374. From those allegations, the First Circuit drew "the obvious inference" that the criminals "who filed the false tax return obtained Webb's [private information] from the . . . data breach, not from some other source." *Id.* at 374.

In contrast, in *Santos-Pagán v. Bayamon Medical Center*, the First Circuit held that the plaintiff failed to allege traceability in a comparable data breach case, reasoning that the complaint (1) did not plausibly allege a temporal connection between the actual misuse and the data breach; (2) lacked allegations supporting the "reasonable inference that those responsible for misusing [the plaintiff's private information] did not obtain [it] from sources other than the data breach"; and (3) failed to "allege whether the information the fraudster would have needed to [commit the actual misuse] is even the kind of information that [the plaintiff] provided . . . or that was exposed." 178 F.4th at 72-73 (emphasis omitted). In so determining, the First Circuit stressed that it did "not hold that every complaint" in a comparable data breach case "requires" *Webb*-like allegations supporting traceability; instead, it held only that the plaintiff's allegations in that case had not "clear[ed] standing's traceability hurdle." *Id.* at 73 n.7.

Taken together, the First Circuit's reasoning in *Webb* and *Santos-Pagán* leaves the plaintiffs' actual misuse theory of harm on precarious ground. On the one hand, the plaintiffs have alleged a plausible temporal connection between the Data Breach and the actual misuse they experienced. While lacking specific dates for the increase in spam communications, the

consolidated complaint alleges that the plaintiffs are "experiencing an increase in spam calls, texts, and emails" "*[a]s a result of* the Data Breach." ECF 13, ¶¶ 142, 158, 173, 188, 203, 218 (emphasis added). That alleged sequence of events—combined with the fact that the operative complaint was filed about six months after the Data Breach occurred—plausibly establishes a close "temporal connection between the [actual misuse] and the timing of the data breach." *Webb*, 72 F.4th at 374.

On the other hand, the plaintiffs here, unlike those in *Webb*, do not allege that the data being misused for spam communications—their email addresses and phone numbers—were among the types of information compromised in the Data Breach. *See Priddy v. ZOLL Med. Corp.*, No. 23-cv-10575-IT, 2025 WL 975234, at *7 (D. Mass. Mar. 31, 2025) ("allegations of increased spam insufficient" for standing where plaintiffs "do not allege that their phone numbers or email addresses were exposed in the Data Breach"). Instead, they assert that the hackers behind the Data Breach used their Private Information, like their Social Security numbers, to obtain their phone numbers and email addresses from *other* sources on the Internet, and then either leveraged the combined information to attempt scams themselves or sold the combined information to criminal scammers in the form of "comprehensive dossiers" called "Fullz" packages. ECF 13, ¶¶ 106-07. As the plaintiffs see it, this Fullz package theory gives rise to a plausible inference of traceability.

In contrast to comparable cases where courts have credited this Fullz package theory, however, the plaintiffs here do not contend that the Private Information they previously safeguarded is the type of data being misused. *See Priddy*, 2025 WL 975234, at *5 (crediting Fullz package theory as basis to trace credit card fraud to data breach where plaintiffs "alleged to be reasonably cautious with securing their Private Information"). They allege that they have been

careful in protecting certain types of "Private Information,"[3] but it is *other* information—their phone numbers and email addresses—that they claim is being misused. Further, the plaintiffs acknowledge that cellphone numbers and email addresses are "unregulated data" that can be "found elsewhere on the internet." ECF 13, ¶ 106. This fact weighs against the inference that "those responsible for misusing [the data] did not obtain such [information] from sources other than the data breach." *Santos-Pagán*, 178 F.4th at 73. All that remains, then, is the temporal proximity between the Data Breach and the alleged increase in spam communications that each plaintiff has experienced. Absent more, the plaintiffs have failed to "clear standing's traceability hurdle" as to their actual misuse theory of harm. *Id.* at 73 n.7.

2. *Material Risk of Future Harm.*

Alternatively, the plaintiffs allege that they face a material risk of future misuse of their Private Information and, as a result, have suffered significant losses of time to mitigate that risk. A material risk of future harm can satisfy the concrete harm requirement for injunctive relief when "'the risk of harm is sufficiently imminent and substantial.'" *Webb*, 72 F.4th at 375 (quoting *TransUnion*, 594 U.S. at 435). To determine whether a material risk of future harm from a data breach exists, courts assess "the totality of the complaint," considering, among other things, (1) whether the data was exposed in a targeted attack rather than inadvertently; (2) whether the compromised data is particularly sensitive; and (3) whether any portion of the stolen data has already been misused, even if the plaintiffs themselves have not yet experienced identity theft or

[3] "Private Information," as defined by the plaintiffs, does not include phone numbers or email addresses, but rather consists of "names, addresses, Social Security Numbers, dates of birth, tax identification numbers, driver's license numbers or state-issued identification card numbers, passport numbers, other government-issued identification numbers, financial account information, and payment card information . . . and . . . medical information and health insurance information." ECF 13, at 1, ¶ 1.

fraud. *Id.* at 375-76. To establish standing to pursue damages on a theory of future harm, "the complaint must also plausibly allege a separate concrete, present harm caused by [the plaintiffs'] exposure to [this] risk" of future harm. *Id.* at 376 (quotation marks omitted).

The First Circuit has "stress[ed]" that the three considerations above "are neither exclusive nor necessarily determinative," and instead "provide guidance" for determining whether a material risk of imminent harm exists. *Id.* at 375. The analysis is a functional one focused on the particular facts alleged in the complaint. And although the First Circuit has not addressed whether a plaintiff has standing to seek relief from a data breach where no plaintiff has adequately alleged actual misuse, other Courts of Appeals have concluded that no actual misuse is necessary where the plaintiffs have otherwise alleged exposure to a substantial risk of identity theft or fraud. *See, e.g.*, *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 156-59 (3d Cir. 2022); *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 634 (7th Cir. 2007).

The consolidated complaint, taken as a whole, adequately alleges a material risk of future misuse. To begin, the plaintiffs allege that their Private Information was stolen when attackers maliciously encrypted Sensata's servers with ransomware. In such a "targeted attack," it "stands to reason that [the compromised data] . . . is more likely to be misused." *Webb*, 72 F.4th at 375. Second, the complaint asserts that the stolen data included "high-risk information such as Social Security numbers and dates of birth," the sensitivity of which "heighten[s]" the risk of future misuse as compared to "basic publicly available information." *Id.* at 376; *see Portier v. NEO Tech. Sols.*, No. 17-cv-30111-TSH, 2019 WL 7946103, at *12 (D. Mass. Dec. 31, 2019) ("Because Social Security numbers are the gold standard for identity theft, their theft is significant."), *report and recommendation adopted*, No. 17-cv-30111, 2020 WL 877035 (D. Mass. Jan. 30, 2020). These

allegations collectively give rise to the reasonable inference that the plaintiffs face a material risk of future misuse of their Private Information as a result of the Data Breach.

The plaintiffs also allege "a separate concrete, present harm caused by [their] exposure to [this] risk [of future harm]" sufficient to pursue damages. *Webb*, 72 F.4th at 376 (quotation marks omitted). They each claim to have spent "significant time dealing with the Data Breach, valuable time [they] otherwise would have spent on other activities, including but not limited to work and/or recreation." ECF 13, ¶¶ 141, 156, 172, 187, 202, 217. "The loss of this time is equivalent to a monetary injury, which is indisputably a concrete injury" for purposes of Article III. *Webb*, 72 F.4th at 377. The plaintiffs additionally assert that their exposure to a material risk of future misuse necessitates ongoing credit and identity theft monitoring. Notwithstanding the free year Sensata provided to them in response to the Data Breach, the plaintiffs expect to pay around $200 per year for such services for a minimum of five years as a result of that ongoing risk. ECF 13, ¶ 132.

Having alleged a material risk of future harm and separate concrete harms caused by their exposure to that risk, the plaintiffs have adequately pled an injury in fact for Article III standing purposes. And because the complaint alleges that Sensata's actions led to the Data Breach that exposed the plaintiffs' sensitive Private Information, both the material risk of future harm and the monetary harms caused by that risk are fairly traceable to Sensata's conduct.

3. *Diminished Value of Private Information.*

The plaintiffs also claim to be injured by the diminished value of their Private Information. They allege that such information "has an inherent market value in both legitimate and dark markets" that has "been damaged and diminished by its compromise and unauthorized release" without "any consideration paid to" them. ECF 13, ¶ 124. Such economic loss, they assert, is sufficient to establish standing. Sensata contends that courts do not recognize diminution in the

value of a person's Private Information as a source of injury in fact, especially where, as here, the plaintiffs do not allege that they attempted to sell that information. Although the First Circuit has not addressed this issue, another session of this Court has explained that "[c]ourts have consistently rejected allegations that the diminution in value of personal information can support standing, particularly where [as here] the plaintiffs have not alleged that they attempted to sell their personal information or that, if they have, the data breach forced them to accept a decreased price for that information." *Taylor v. UKG, Inc.*, 693 F. Supp. 3d 87, 101 (D. Mass. 2023) (quotation marks omitted) (collecting cases). The plaintiffs counter that other courts have noted a "growing trend . . . to recognize the lost property value of personal information." *Rodriguez v. ByteDance, Inc.*, No. 23-cv-4953, 2025 WL 672951, at *14 (N.D. Ill. Mar. 3, 2025) (quotation marks omitted).

Even assuming that an individual's sensitive personal information has economic value for Article III purposes, the plaintiffs here have failed to allege any concrete diminution in that value. The consolidated complaint does not allege that the plaintiffs tried to sell their data or that they did so but were forced to accept a lower price due to the Data Breach. *See Taylor*, 693 F. Supp. 3d at 101. Nor have the plaintiffs complained of economic consequences that could result from diminished value of one's Private Information. For example, they have not "alleged that their buying power in the marketplace of credit has been diminished." *Priddy*, 2025 WL 975234, at *8. Absent any developed argument on why the theft of their personal data amounts to a concrete diminution of that data's value, the plaintiffs have failed to plausibly allege standing on this theory.

B. <u>Redressability.</u>

The plaintiffs must also demonstrate that each form of relief they seek "is likely to redress" their injuries. *Pagán*, 448 F.3d at 27. The consolidated complaint requests various forms of relief, including damages, restitution, a declaratory judgment that Sensata breached its duties, and

injunctive relief compelling Sensata to improve its data security practices, provide ongoing credit and identity theft monitoring, inform the plaintiffs of the extent of the Data Breach, and cease any unfair, deceptive, and unconscionable practices. The Court will address each form of relief in turn.

The plaintiffs have standing to pursue damages and restitution. Those forms of relief would redress the lost work time the plaintiffs have devoted to mitigating the harm of the Data Breach and the cost of ongoing credit and identity theft monitoring. *See Webb*, 72 F.4th at 376-77 (time spent taking protective measures that otherwise would have been put to productive use is cognizable monetary harm redressable by damages); ECF 13, at 3, ¶ 9 (citing "lost opportunity costs" and "lost time" that "otherwise would have been spent on . . . work" as injuries); *id.* ¶¶ 141, 156, 172, 187, 202, 217 (same); *id.* ¶¶ 132, 144, 160, 175, 190, 205, 220 (future costs of credit monitoring). They likewise have standing to seek certain forms of injunctive relief, including an order requiring Sensata to provide them with continued credit monitoring services. Such an order would redress the material risk of identity theft each plaintiff faces and the annual costs they anticipate paying for such services. *See Priddy*, 2025 WL 975234, at *9. Similarly, the plaintiffs have standing to seek an order compelling Sensata to provide more detail about the scope of the Data Breach, because knowing what data was compromised would enable them to better monitor for, and respond to, future misuse. The plaintiffs do not, however, have standing to seek an order "enjoin[ing] [Sensata] from further unfair, deceptive, and unconscionable practices and making untrue statements about the [Data Breach] and the stolen Private Information," ECF 13, at 76, because the complaint is devoid of any allegation that Sensata "is likely to make deceptive statements about that past breach in the future or that any such statements would harm the plaintiffs, particularly now that they know about the breach." *Webb*, 72 F.4th at 378.

Whether the plaintiffs have standing to pursue injunctive relief ordering Sensata to improve its data security practices is a closer question. In *Webb*, the First Circuit concluded that the plaintiffs lacked standing to pursue an analogous injunction "requiring [the defendant] to improve its cybersecurity systems" because "[a]ny such relief would safeguard only against a future breach" and the plaintiffs had "not allege[d] that any such future breach will occur." *Id.* at 378. The plaintiffs here, in contrast, have alleged that "[t]he risk of another [data] breach is real, immediate, and substantial" because Sensata "still possesses [their] Private Information" and its "data security measures remain inadequate" due to the company's insufficient encryption, data purges, security trainings, and breach detection. *Id.* ¶¶ 369-70, 374. These allegations identify specific deficiencies in Sensata's current data security practices and are thus "sufficient in the data breach context." *Baton v. Ledger SAS*, 740 F. Supp. 3d 847, 881-82 (N.D. Cal. 2024); *see In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1141 (C.D. Cal. 2021) (finding standing to seek injunctive relief when defendants "announced few if any changes to their data security infrastructure . . . which permitted the breach to occur"). Accordingly, the plaintiffs have plausibly alleged that they have Article III standing to seek an injunction compelling Sensata to improve its inadequate security system. And for the same reasons, a declaration that Sensata breached its duties to protect the plaintiffs' data is likely to redress their injuries. *See In re MOVEit Customer Data Sec. Breach Litig.*, No. 23-md-3083-ADB-PGL, 2025 WL 2176590, at *34 (D. Mass. July 31, 2025) ("An allegation of continued inadequacy of [a] Defendant['s] security measures substantiates a claim for declaratory judgment in a data breach case." (quotation marks omitted)).

* * *

In sum, the plaintiffs have adequately alleged that the material risk of future misuse of their Private Information, and the economic harm resulting from that risk, are injuries in fact traceable

to Sensata's conduct. Those injuries may be redressed by damages, restitution, a declaratory judgment, and orders compelling Sensata to address the inadequacies in its data security, pay for the plaintiffs' continued credit monitoring services, and provide additional information about the scope of the Data Breach. Accordingly, the plaintiffs have sufficiently pled Article III standing.

**II. Plausibility of the Plaintiffs' Claims.**

Sensata alternatively contends that the plaintiffs have failed to allege any cognizable claims for relief. After resolving the parties' disagreement about the law applicable to the common law claims, the Court will address each of the plaintiffs' claims in turn.

A. Choice of Law.

The parties dispute, as a threshold matter, which state's substantive law applies to the plaintiffs' common law claims. Although the parties relied on Massachusetts law in briefing the motion to dismiss, the plaintiffs argued at the hearing that their claims should be analyzed according to their respective home states' laws. As they see it, because they were injured where they reside—in Massachusetts, Minnesota, California, Arizona, Rhode Island, and Michigan—the Court should evaluate their respective common law claims according to the laws of each state, dismissing only those claims brought by plaintiffs whose home state laws would require it. Disagreeing, Sensata contends that Massachusetts law should govern all of the plaintiffs' common law claims.

Generally, "[i]n determining what state law pertains, the court must employ the choice-of-law framework of the forum state," which is Massachusetts. *Crellin Techs., Inc. v. Equipmentlease Corp.*, 18 F.3d 1, 4 (1st Cir. 1994). Under Massachusetts' choice of law analysis, the Court must first consider whether a substantive conflict of law exists, because "'only actual conflicts between the laws of different jurisdictions must be resolved.'" *UBS Fin. Servs., Inc. v. Aliberti*, 483 Mass.

396, 405 n.12 (2019) (quoting *Kaufman v. Richmond*, 442 Mass. 1010, 1012 (2004)). The parties here contend that a conflict exists only between the states' approaches to the economic loss rule, such that the plaintiffs' negligence claim may be barred by the rule under some states' laws but not others. *See* ECF 29, at 3-4; ECF 30, at 3.[4] They do not argue that any conflict exists between the legal principles governing the states' unjust enrichment or breach of implied contract claims. *See* ECF 29, at 4-5 ("[T]here is no actual conflict between the laws governing each Plaintiffs' implied contract claim" or the "Plaintiffs' unjust enrichment claim[s]."); ECF 30, at 3-4 ("The relevant states . . . recognize a breach of implied contract claim under similar circumstances" and "recognize an unjust enrichment claim where . . . a defendant is alleged to have unjustly retained monetary benefits."). Absent any developed argument that a conflict exists as to those claims, and in light of the parties' reliance on Massachusetts law in briefing the motion to dismiss, the Court accepts the parties' apparent agreement that Massachusetts law governs the claims for breach of contract and unjust enrichment. *See Nautilus Ins. Co. v. Dearaujo*, No. 20-cv-11508-ADB, 2021 WL 3375402, at *2 (D. Mass. Aug. 3, 2021). Believing that agreement to be reasonable, the Court will forgo an independent choice of law analysis for those claims and conduct one only for the plaintiffs' negligence claim. *Borden v. Paul Revere Life Ins. Co.*, 935 F.2d 370, 375 (1st Cir. 1991).

Where there is likely an actual conflict, Massachusetts courts look to the state with "the most significant relationship to the occurrence and the parties" in conducting the choice of law analysis. *UBS*, 483 Mass. at 405 n.12 (quotation marks omitted). This is a "functional approach," guided by the Restatement (Second) of Conflict of Laws (1971) ("Restatement"). *Cosme v. Whitin Mach. Works, Inc.* 417 Mass. 643, 646, 649-50 (1994); *see UBS*, 483 Mass. at 405 n.12. For tort

[4] Although the plaintiffs opine on the states' various approaches to non-economic losses and negligence *per se*, they do not identify any conflict between the states' laws as to those issues. *See* ECF 29, at 2-4; ECF 30, at 2-3.

claims, such factors may include "the place where the injury occurred, the place where the conduct causing the injury occurred, the domicil, residence, nationality, place of incorporation and place of business of the parties, and the place where the relationship, if any, between the parties is centered." *Cornwell Ent., Inc. v. Anchin, Block & Anchin, LLP*, 830 F.3d 18, 34 (1st Cir. 2016) (quotation marks omitted); *see* Restatement § 145.

Assuming, without deciding, that an actual conflict between the states' laws on negligence exists in this case, the Court will evaluate whether Massachusetts or each of the plaintiffs' home states bears the most significant relationship to the transaction and the parties. The plaintiffs argue, and Sensata does not dispute, that their injuries occurred where they reside: in Minnesota, California, Arizona, Rhode Island, Massachusetts, and Michigan. The location of the injury is, however, "just one factor among many that Massachusetts courts consider in determining which state has the most significant relationship to a claim sounding" in tort. *Cornwell*, 830 F.3d at 34. And here, the other factors do not support application of six different states' laws. The consolidated complaint alleges that Sensata's principal place of business is in Massachusetts, that Sensata "regularly conducts business in Massachusetts," and that "a substantial part of the events, acts, and omissions giving rise to [their] claims occurred in" Massachusetts. ECF 13, at 4-5, ¶¶ 19, 21-22. The plaintiffs further allege that Sensata failed to invest sufficient time, money, and resources in data security. *Id.* ¶¶ 24-25, 29-32. Together, these allegations indicate that Massachusetts is likely the place where the conduct causing the injury occurred. The consolidated complaint lacks allegations regarding where the relationship between the parties was centered. It does not, for example, specify where the plaintiffs' employment contracts with Sensata were formed or where Sensata stored their Private Information.

The inquiry thus boils down to the competing interests of Massachusetts—the state where the alleged tortfeasor resides and committed the contested conduct—and of the states where the plaintiffs were injured. The former outweighs the latter in this case, because "Massachusetts's interest in having [Sensata] comply with its own tort principles governing cybersecurity is greater than the interest of each [p]laintiff's home state in seeing their residents compensated for injuries allegedly caused by a foreign corporation's misconduct." *In re MOVEit*, 2025 WL 2176590, at *7; *see Cosme*, 417 Mass. at 646-50 (applying Restatement § 145 factors and concluding Massachusetts had dominant interest in seeing its laws enforced where alleged tortious conduct took place there). This conclusion is buttressed by the fact that the unwieldy "alternative would be to fragment the liability analysis" among several competing jurisdictions. *In re MOVEit*, 2025 WL 2176590, at *7; *see Cosme*, 417 Mass. at 650 (considering "[s]implification of the judicial task" in determining which state has more significant relationship). Accordingly, the Court will apply Massachusetts law to the common law claims in this case.

B. Negligence Claim.

Count I asserts that Sensata's negligent failure to employ sufficient data security practices or provide adequate notice of the Data Breach caused harm to the plaintiffs. This harm, they allege, consists of the actual misuse of their data; the risk of future fraud and misuse of that data; lost time spent mitigating present and imminent misuse; a diminution in the value of their Private Information; and emotional distress in the form of anxiety, fear, and sleep disruption. The plaintiffs claim that, as a result of this harm, they have suffered and will continue to suffer compensable damages in the form of lost time spent mitigating the effects of the Data Breach, in addition to annual $200 payments for credit and identity theft monitoring for a minimum of five years.

Sensata contends that none of these alleged harms constitute cognizable injuries under Massachusetts tort law. In Sensata's view, the plaintiffs' allegations of an increased risk of harm, a diminution in the value of their Private Information, anxiety, spam messages, and lost time do not satisfy the damages element of a negligence claim. *See In re Shields Health Care Grp., Inc. Data Breach Litig.*, 721 F. Supp. 3d 152, 161 n.5 (D. Mass. 2024) ("emotional distress and lost time" are "sufficient for Article III standing" but may not be for negligence). But Sensata ignores the plaintiffs' allegations that, as a result of the Data Breach, they will be forced to expend $200 per year on ongoing credit and identity theft monitoring for at least five years. Courts have routinely held that where, as here, the plaintiffs have adequately pled a substantial risk that their data will be misused, "[c]osts of future credit monitoring are . . . cognizable injuries." *In re LastPass Data Sec. Incident Litig.*, 742 F. Supp. 3d 109, 123 (D. Mass. 2024); *see Donovan v. Philip Morris USA, Inc.*, 455 Mass. 215, 225-26 (2009) (substantial increase in risk of cancer and medical necessity of monitoring with its attendant cost may adequately establish the elements of injury and damages). The plaintiffs have, accordingly, alleged a cognizable injury.[5]

Sensata next contends that the negligence claim must be dismissed because economic losses are unrecoverable under Massachusetts tort law and the consolidated complaint alleges no other cognizable injury. Generally, in Massachusetts, "'purely economic losses are unrecoverable in tort . . . actions in the absence of personal injury or property damage.'" *In re TJX Cos. Retail Sec. Breach Litig.*, 564 F.3d 489, 498 (1st Cir. 2009) (quoting *Aldrich v. ADD Inc.*, 437 Mass. 213, 222 (2002)); *see Cumis Ins. Soc'y, Inc. v. BJ's Wholesale Club, Inc.*, 455 Mass. 458, 469-70 (2009).

[5] That conclusion is not altered by the fact that the plaintiffs had not yet purchased credit monitoring upon filing their consolidated complaint because, as alleged, Sensata provided the first year of such monitoring for free, and that pleading was filed about four months after the plaintiffs were notified of the Data Breach. ECF 13, at 10, ¶ 21.

"Like 'duty' and 'proximate cause,' the [economic loss] doctrine cabins what could otherwise be open-ended negligence liability to anyone affected by a negligent act." *TJX*, 564 F.3d at 498. The doctrine bars negligence liability, for example, where there exists an express contract between the plaintiff and defendant or where a defective product inflicts no damage on person or property. *See Rule v. Fort Dodge Animal Health, Inc.*, 604 F. Supp. 2d 288, 293 (D. Mass. 2009).

There are, however, exceptions to this rule. For instance, Massachusetts courts have typically not applied the doctrine where a fiduciary relationship existed between the parties, and the Supreme Judicial Court has indicated that the parties' ability "to bargain freely concerning the allocation of risk" may impact the rule's applicability. *Clark v. Rowe*, 428 Mass. 339, 342-43 (1998); *see Priddy*, 2025 WL 975234, at *10 (collecting cases not applying economic loss rule in medical data breach cases where plaintiffs adequately alleged fiduciary duty by holder of their confidential information). Nor does the rule apply to certain torts such as defamation, *Ravnikar v. Bogojavlensky*, 438 Mass. 627, 630-31 (2003), or libel, *Shafir v. Steele*, 431 Mass. 365, 373 (2000). In *Portier v. NEO Technology Solutions*, another session of this Court likewise deemed the economic loss doctrine inapplicable to negligence claims "based on the theft and misuse of employees' [Private Information] that they entrusted to their employer as a condition of employment." 2019 WL 7946103, at *18.

The plaintiffs contend that the economic loss rule does not bar recovery from their claims because they, like the *Portier* plaintiffs, "provided their Private Information to [their employer] expecting it to reasonably safeguard [that information] as a condition of receiving and maintaining the information." ECF 25, at 12. The Supreme Judicial Court has not yet addressed whether the economic loss rule applies to such a case. Accordingly, the Court "must ascertain the rule the state court would most likely follow under the circumstances, even if its independent judgment on the

question might differ." *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 66 (1st Cir. 2004) (citation modified). "In that endeavor, the federal court may seek guidance from a wide range of sources, including but not limited to analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law." *Id.* (quotation marks omitted).

*Portier* conducted such an analysis and concluded that "Massachusetts appellate courts would likely follow a recent decision of the Pennsylvania Supreme Court, which permitted recovery for pecuniary losses caused by negligence" in a comparable data breach case. 2019 WL 7946103, at *18. In *Dittman v. UPMC*, the Pennsylvania Supreme Court reasoned that its precedent did "not stand for the proposition that the economic loss doctrine . . . precludes all negligence claims seeking solely economic damages." 649 Pa. 496, 525 (2018). Rather, it explained, "Pennsylvania has long recognized that purely economic losses are recoverable in a variety of tort actions," so long as "the plaintiff can establish the defendant's breach of a legal duty arising under common law that is independent of any duty assumed pursuant to a contract." *Id.* at 499, 525 (quotation marks omitted). Because an employer's "duty to safeguard" its employees' private information stems not from a contract but from its "affirmative acts of collecting and storing its employees' personal and financial information on its internet accessible computer system," *Dittman* determined, the economic loss doctrine does not bar an employee's negligence claims arising from disclosure of that data. *Portier*, 2019 WL 7946103, at *18-20.

*Portier* concluded that Massachusetts courts would likely adopt the same reasoning because, as "in *Dittman*, courts applying Massachusetts law have examined the source of the duty that was allegedly breached and have permitted recovery in tort if the duty arises independently of a party's contractual obligations." *Id.* at *21 (quotation marks omitted) (collecting cases). That

conclusion was bolstered by Massachusetts courts' recognition of fiduciary relationships as an exception to the economic loss rule. As *Portier* explained, while "an employer generally does not owe a fiduciary duty an employee," an employer may nevertheless have a duty to protect the employee from harm "where there is a special relationship" between them. *Id.* (quotation marks omitted). Such "a special relationship can be inferred" when an employer collects, stores, and retains control over its employees' private or sensitive information, and those employees are forced to rely on their employer to protect that information. *Id.*

Having carefully considered the reasoning in *Portier*, this Court agrees that the Supreme Judicial Court would likely hold that the economic loss rule does not bar negligence claims in data breach cases where an employer has required its employees to submit their private information as a condition of employment, retained control over that information, and allegedly breached a common law duty of care to protect such information. Because the plaintiffs have adequately alleged that Sensata collected and stored their Private Information as a condition of their employment, and then breached multiple non-contractual duties to, among other things, "exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting" that information, the economic loss doctrine does not apply. ECF 13, ¶¶ 40-97. Count I will therefore not be dismissed.[6]

[6] Sensata also argues that the plaintiffs' reliance on its alleged violation of the Federal Trade Commission Act (the "FTC Act"), 15 U.S.C. § 45, constitutes a claim of negligence *per se* that must be dismissed because Massachusetts does not recognize such claims. *See* ECF 13, ¶¶ 241, 257, 259-60. True, negligence *per se* does not exist as a cause of action separate from a general negligence action in Massachusetts. *Juliano v. Simpson*, 461 Mass. 527, 532 (2012). But the plaintiffs do not assert any negligence *per se* claim. They rely on Sensata's alleged violation of the FTC Act only insofar as it supports their argument that Sensata breached its common law duties of care by failing to comply with industry standards. Because Sensata does not dispute that the complaint's other allegations plausibly allege a duty of care, the plaintiffs' additional reliance on the FTC Act does not require dismissal of their negligence claim. *See* ECF 23, at 9-10; ECF 26, at 5 n.2.

C. Breach of Implied Contract Claim.

Sensata next seeks dismissal of the plaintiffs' claim for breach of an implied contract between the parties. Under Massachusetts law, implied contracts exist in two forms: contracts implied in fact and contracts implied in law. *Curtis v. Herb Chambers I-95, Inc.*, 458 Mass. 675, 680 (2011); *see Rauseo v. Intercont'l I Bulfinch, LLC*, 61 Mass. App. Ct. 1120, at *5 (2004) (Rule 1:28 decision). The former is a "true contract" where there is a meeting of the minds—or a "tacit agreement"—between the parties, evidenced by their conduct and relationship. *Curtis*, 458 Mass. at 680 (citing *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 456 (6th Cir. 2001)); *see T.F. v. B.L.*, 442 Mass. 522, 526-27 (2004) (describing facts giving rise to implied contract in the absence of an express agreement). Under Massachusetts law, a "contract implied in fact requires the same elements as an express contract and differs only in the method of expressing mutual assent." *Katz v. Pershing, LLC*, 672 F.3d 64, 74 (1st Cir. 2012) (quotation marks removed). In contrast, a contract implied in law is not a "true contrac[t]" but rather a "quasi contrac[t]" with obligations imposed by law "sometimes as a matter of public policy and sometimes to prevent the unjust enrichment of one person at the expense of another." *Rauseo*, 61 Mass. App. Ct. at *5.

Here, the plaintiffs assert both theories as potential bases for their claim. Sensata counters that the plaintiffs have failed to adequately allege either theory, so their breach of contract claim must therefore be dismissed.[7]

[7] Sensata argues that the plaintiffs have failed to allege actual harm cognizable under a breach of implied contract claim. That argument is unavailing. For the same reasons the consolidated complaint sufficiently asserts a cognizable injury for the plaintiffs' negligence claim, their allegations concerning the risk of future misuse and the cost of ongoing credit monitoring adequately plead a cognizable injury for their breach of contract claim. *See LastPass*, 742 F. Supp. 3d at 123 (analogous injuries satisfying elements for both tort and contract claims).

1. *Breach of Contract Implied in Fact.*

To state a claim for breach of contract implied in fact, a plaintiff must allege "that there was an agreement between the parties; the agreement was supported by consideration; the plaintiff was ready, willing, and able to perform his or her part of the contract; the defendant committed a breach of the contract; and the plaintiff suffered harm as a result." *Bulwer v. Mount Auburn Hosp.*, 473 Mass. 672, 690 (2016). Sensata argues, and the Court agrees, that the plaintiffs' implied-in-fact theory must fail because the consolidated complaint does not adequately allege an agreement between the parties.

To prove the existence of an agreement, the plaintiffs must demonstrate that the parties "agreed, either expressly or impliedly by words or conduct." *Curtis*, 458 Mass. at 680. It is undisputed that no express agreement exists between Sensata and the plaintiffs regarding data security. Instead, the plaintiffs contend that a "meeting of the minds occurred" whereby the plaintiffs agreed "to provide accurate and complete Private Information in exchange for [Sensata's] collective agreement to . . . protect [that] Private Information." ECF 13, ¶ 282. That agreement, they argue, is evinced by Sensata's Code of Conduct and Privacy Policy, which represent that Sensata will, among other things, "always . . . [p]rotect personal information from loss, misuse, or disclosure" by "implement[ing] technical and organisational measures to ensure a level of security appropriate to the risk to the personal data [they] process." ECF 13, at 7, ¶¶ 29-30 (emphases omitted).

The mere existence of such language in a policy or code of conduct does not, however, evince an implied agreement between the parties. Where the plaintiffs do not allege that they signed, acknowledged their understanding of, or otherwise "affirmative[ly] accept[ed]" Sensata's privacy policies, it cannot be said that the parties impliedly agreed to those policies' terms. *Shea*

*v. Am. Int'l Coll.*, No. 24-cv-11449-AK, 2025 WL 2577196, at *5 (D. Mass. Sept. 5, 2025); *see Terravecchia v. Fleet Bank*, No. 20043086F, 2007 WL 1056818, at *2-3 (Mass. Super. Ct. Mar. 21, 2007) (no implied agreement where employee did not sign or manifest assent to manual or acknowledge that they understood the terms). Nor do the plaintiffs' allegations that they provided their Private Information to Sensata as a condition of their employment or that Sensata had a duty imposed by its own policies, law, and industry standards demonstrate the requisite "meeting of the minds" for a contract implied in fact. *I & R Mech., Inc. v. Hazelton Mfg. Co.*, 62 Mass. App. Ct. 452, 455 (2004) (agreement requires parties to "give their mutual assent by having a meeting of the minds on the same proposition on the same terms at the same time" (quotation marks omitted)). Though such allegations may support a finding of a contract implied in *law*, they do not cure the plaintiffs' failure "to allege facts showing mutual assent with the required certainty." *Shea*, 2025 WL 2577196, at *5.

2. *Breach of Contract Implied in Law.*

The consolidated complaint does, however, sufficiently state a claim for a breach of contract implied in law. A contract implied in law—or a "quasi contract"—is "an obligation created by law for reasons of justice, without any expression of assent and sometimes even against a clear expression of dissent." *Salamon v. Terra*, 394 Mass. 857, 859 (1985) (quotation marks omitted). Those reasons of justice may include the prevention of the unjust enrichment of one person at the expense of another, as well as "matter[s] of public policy." *Rauseo*, 61 Mass. App. Ct. at *5. At bottom, because the theory of an implied-in-law contract involves "a legal obligation closely akin to a duty to make restitution," considerations "of equity and morality play a large part" in determining whether such a contract exists. *Salamon*, 394 Mass. at 859 (quotation marks

omitted). Accordingly, courts consider whether a plaintiff's "reasonable expectations" were defeated by the defendant's actions. *Liss v. Studeny*, 450 Mass. 473, 480-81 (2008).

The consolidated complaint alleges that the plaintiffs "were required to give their sensitive and confidential Private Information to" Sensata as "a condition of employment, participation in [its] health plan, [and] other business-related reasons." ECF 13, ¶ 33. The plaintiffs "understood that" Sensata, in so requiring, "would use adequate cybersecurity measures to protect the Private Information that they were required to provide." *Id.* ¶¶ 280, 299. That expectation, they argue, was reasonable based on the "highly sensitive" nature of the information they were required to provide, the amount of information obtained and controlled by Sensata, the substantial increase in cyber-attacks targeting entities like Sensata, and Sensata's assurances in its code of conduct and private policies that it, among other things, "implement[s] technical and organisational measures to ensure a level of security appropriate to the risk to the personal data [it] process[es]." *Id.*, at 7, ¶¶ 30, 40, 275-83, 299 (emphasis omitted). Absent such an understanding, the plaintiffs "would not have entrusted their Private Information to" Sensata. *Id.* ¶ 283.

Together, these allegations plausibly demonstrate that the plaintiffs had a reasonable expectation that Sensata would adhere to industry standards for data protection in compliance with its own policies. The complaint further alleges that Sensata defeated that reasonable expectation when it failed to encrypt, safeguard, or otherwise "make reasonable efforts to use the latest security technologies designed to help ensure that the Private Information was secure." ECF 13, ¶ 288; *see Liss*, 450 Mass. at 480 ("The injustice of the enrichment or detriment equates with the defeat of a person's reasonable expectations."). Because those failures exposed the plaintiffs to harm, considerations of equity, morality, and public policy warrant the imposition of a quasi-contract. The plaintiffs have, accordingly, adequately pled a claim for breach of contract implied in law.

D. Unjust Enrichment Claim.

Count III asserts that Sensata has been unjustly enriched by its use of the plaintiffs' Private Information to facilitate business operations without the necessary investments in data security measures to protect that information. "Unjust enrichment is the 'retention of money or property of another against the fundamental principles of justice or equity and good conscience.'" *Columbia Plaza Assocs. v. Ne. Univ.*, 493 Mass. 570, 588-89 (2024) (quoting *Sacks v. Dissinger*, 488 Mass. 780, 789 (2021)). "To plausibly state a claim for unjust enrichment, the plaintiff[s] must allege: (1) a benefit conferred upon [Sensata] by the plaintiff[s]; (2) an appreciation or knowledge by [Sensata] of the benefit; and (3) acceptance or retention by [Sensata] of the benefit under the circumstances would be inequitable without payment for its value." *Tomasella v. Nestlé USA, Inc.*, 962 F.3d 60, 82 (1st Cir. 2020) (quotation marks omitted).

The consolidated complaint plausibly states a claim of unjust enrichment. It alleges that Sensata knowingly profited from its receipt of the plaintiffs' Private Information, which it used to facilitate business operations, and was "enriched" by "saving the costs [it] reasonably should have expended on data security measures." ECF 13, ¶¶ 297, 300-01. It further claims that the plaintiffs had a reasonable expectation that Sensata would use adequate cybersecurity measures, and that Sensata understood as much. *Id.* ¶¶ 298-99. Nevertheless, the plaintiffs allege, Sensata used "cheaper, ineffective security measures" that failed to protect their highly sensitive Private Information. *Id.* ¶ 301. At this early juncture, these allegations adequately plead unjust enrichment.

The Court need not, as Sensata argues, dismiss the unjust enrichment claim now because the plaintiffs may have an adequate remedy at law in their other claims. The consolidated complaint states that the unjust enrichment "claim is pleaded in the alternative to the breach of implied contract claim." *Id.* ¶ 296. While "damages for breach of contract and unjust enrichment

are mutually exclusive, 'it is accepted practice to pursue both theories at the pleading stage.'" *Zelby Holdings, Inc. v. Videogenix, Inc.*, 92 Mass. App. Ct. 86, 93 (2017) (quoting *Lass v. Bank of Am., N.A.*, 695 F.3d 129, 140-41 (1st Cir. 2012)). There is no express breach of contract claim here and, where there is ambiguity over whether the implied breach of contract claim affords the plaintiffs an adequate remedy at law, dismissal of the unjust enrichment claim at this early stage in the case would be premature. *See Tomasella*, 962 F.3d at 84.

E. California Consumer Privacy Act Claim.

Count V asserts a claim under the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code § 1798.150 *et seq.* The CCPA authorizes consumers "whose nonencrypted and nonredacted personal information[8] . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of [a] business' violation of the duty to implement and maintain reasonable security procedures and practices" to "institute a civil action" for damages, injunctive or declaratory relief, or any other relief that the court deems proper. *Id.* § 1798.150(a)(1). Plaintiff Islas, the resident of California, alleges that he was harmed by Sensata's violation of its duty to implement and maintain reasonable security procedures and practices appropriate to the Private Information that it required him to provide.

[8] As relevant here, "personal information" is defined as an "individual's first name or first initial and the individual's last name in combination with any one or more" of the individual's "(i) Social security number"; "(ii) Driver's license number, California identification card number, tax identification number, passport number, military identification number, or other unique identification number issued on a government document commonly used to verify the identity of a specific individual"; "(iii) Account number or credit or debit card number, in combination with any required security code, access code, or password that would permit access to an individual's financial account"; "(iv) Medical information"; "(v) Health insurance information"; "(vi) Unique biometric data generated from measurements or technical analysis of human body characteristics, such as a fingerprint, retina, or iris image, used to authenticate a specific individual"; or "(vii) Genetic data." Cal. Civ. Code § 1798.81.5(d)(1)(A).

Sensata contends that Islas' CCPA claim is insufficiently pled because the consolidated complaint "make[s] no allegation that any specific personal information belonging to [Islas] is at issue here" and "offer[s] only boilerplate allegations that [Sensata's] security was inadequate." ECF 23, at 15. Both arguments ring hollow. The complaint clearly and repeatedly alleges that the plaintiffs' Private Information—including some combination of their names, addresses, social security numbers, dates of birth, tax identification numbers, driver's license numbers or state-issued identification card numbers, passport numbers, other government-issued identification numbers, financial account information, payment card information, medical information, and health information—was improperly accessed and obtained by unauthorized third parties in the Data Breach. Further, it alleges that Sensata did not provide the plaintiffs with more detailed information about the data compromised in the breach. And, far from "boilerplate," the complaint specifically alleges that Sensata failed to encrypt its network, delete Private Information when it was no longer needed, protect its network with "sufficient multi-layer data security technologies or effective firewalls," establish "sufficiently effective endpoint detection," or train its employees to identify hacking threats and defend against them. ECF 13, ¶¶ 24, 86, 88-90. The CCPA claim will not, accordingly, be dismissed for insufficient allegations.

Trying another tack, Sensata contends that Islas' CCPA claim must be dismissed for failure to comply with the statute's 30-day pre-suit notice requirement. The CCPA provides that, "prior to initiating any action against a business for statutory damages on an individual or class-wide basis," a consumer must first provide the business with "30 days' written notice identifying the specific provisions of this title the consumer alleges have been or are being violated." Cal. Civ. Code § 1798.150(b). If "cure is possible" and "within the 30 days the business actually cures the noticed violation and provides the consumer an express written statement that violations have been

cured and that no further violations shall occur," no action for statutory damages may be initiated. *Id.* No notice is required before "initiating an action solely for actual pecuniary damages." *Id.*

According to the consolidated complaint, "Islas mailed a CCPA notice letter to [Sensata's] registered service agent, which was delivered on July 21, 2025." ECF 13, ¶ 329. Sensata asserts that because this lawsuit was initiated on June 13, 2025, and thus was already pending when the notice was sent, the CCPA claim must be dismissed. Islas counters that the CCPA's 30-day notice requirement is not yet applicable because the operative complaint in this case—the consolidated class action complaint filed on October 2, 2025—makes clear that he has not yet sought statutory damages under the CCPA. Indeed, that pleading states that although Islas believes that "cure is not possible" in this case, he "intends to promptly amend" the complaint after the requisite 30-day cure period has passed. *Id.* In any case, he argues, even if the notice requirement applied, he complied with it by providing notice over two months before the operative complaint was filed.

Islas has the better argument. California courts evaluating analogous consumer protection laws have concluded that the requisite notice period relates to the operative complaint seeking the relief for which notice is required. *See Morgan v. AT&T Wireless Servs., Inc.*, 177 Cal. App. 4th 1235, 1260-61 (2009) (vacating dismissal of third amended complaint because plaintiffs complied with California's Consumers Legal Remedies Act ("CLRA") by providing required 30-day notice four months before filing, even though second amended complaint raising statutory damages for first time was previously dismissed without prejudice for failure to comply with notice); *Corra v. Energizer Holdings, Inc.*, 962 F. Supp. 2d 1207, 1221 (E.D. Cal. 2013) (explaining *Morgan* and rejecting a reading of the CLRA requiring notice before *any* action is filed, "regardless of relief requested"). Another session of this Court, too, has determined that the CCPA's 30-day notice requirement applies to the operative complaint, not the initial complaint. *See In re MOVEit*

*Customer Data Sec. Breach Litig.*, No. 23-md-3083-ADB-PGL, 2025 WL 2179475, at *24, *26 (D. Mass. July 31, 2025). Finding this precedent persuasive, the Court concludes that, because Islas has not yet sought statutory damages from Sensata, the CCPA's 30-day notice requirement has not yet been triggered. But even if that requirement did apply where, as here, the operative complaint does not seek statutory damages, it would apply to the operative complaint, filed in October 2025 and over two months after Islas sent Sensata the CCPA notice. The CCPA claim will not be dismissed.

F. California Consumer Records Act Claim.

Islas asserts in Count VI that Sensata violated the California Consumer Records Act ("CCRA"), Cal. Civ. Code § 1798.80 *et seq.*, by failing to promptly notify him of the Data Breach. The CCRA requires businesses operating in California, upon discovery or notification of a breach of their security system, to disclose that breach to California residents "whose unencrypted personal information was, or is reasonably believed to have been, acquired by an unauthorized person." *Id.* § 1798.82(a)(1). When the business owns the personal data that was breached, the disclosure must "be made within 30 calendar days of discovery or notification of the data breach," but notice may be delayed "to accommodate the legitimate needs of law enforcement . . . or as necessary to determine the scope of the breach and restore the reasonable integrity of the data system." *Id.* §§ 1798.82(a)(2)(A)-(B). When the business does not own the personal data that was breached, the data owner must be notified of the breach "immediately following discovery." *Id.* § 1798.82(b). To plead a cognizable CCRA claim, a plaintiff must allege incremental harm resulting from the delayed notification. *See Jackson v. Health Ctr. Partners of S. California*, No. 24-cv-106-BEN-DDL, 2024 WL 3708867, at *5 (S.D. Cal. Aug. 7, 2024).

Sensata contends that this claim must be dismissed because Islas fails to allege incremental damages arising from the delayed notification in this case. Islas does not dispute that incremental harm is required under the CCRA, but in his view, he adequately alleges such harm. In particular, the consolidated complaint alleges that, because of the delay in notice, Islas and the California Subclass "were unable to protect themselves" and "suffered incrementally increased damages that they would not have suffered with timelier notice." ECF 13, ¶ 339. Timelier notice, the complaint asserts, would have enabled them to "take appropriate steps to mitigate the potential for identity theft and other damages." *Id.* ¶ 257. Sensata responds that such allegations are conclusory because Islas fails to specify what incremental harm he suffered, what steps he would have taken if notified of the breach earlier, or how those steps could have prevented his incremental damages.

Sensata's arguments are not well taken. Viewing the consolidated complaint as a whole and drawing all reasonable inferences in Islas' favor, the Court concludes that he has alleged sufficient incremental harm to state a CCRA claim. He alleges that his Private Information remained unprotected and unsecured for as long as two months between the Data Breach and the date he received notice of the breach, and that, during that time, "unauthorized individuals [could] easily access" that information. *Id.* ¶ 100. Such unbridled access increased the risk that such information would be posted or sold "on the dark web—further exposing the information" to unauthorized individuals whose misuse of the data could take "years to discover." *Id.* ¶¶ 104-05. Upon learning of the Data Breach, Islas took protective actions, including "changing [his] passwords," "resecuring [his] own computer systems," and monitoring his financial accounts. *Id.* ¶¶ 115, 156. Taken together, these allegations give rise to the plausible inference that Sensata's failure to promptly notify Islas of the Data Breach incrementally increased his risk of future identity theft and that, had he received earlier notice, he would have immediately implemented

protective measures to mitigate those risks. That is enough to survive a motion to dismiss. *See Jackson*, 2024 WL 3708867, at *5 (denying motion to dismiss where plaintiff alleged that "delay prevented him from taking steps in the most expedient time possible to mitigate the fallout from his personal information being stolen such as purchasing dark web monitoring or an identity theft protection service" (quotation marks omitted)).

G. California Unfair Competition Law Claim.

Count IV, also brought by Islas, claims that Sensata engaged in unlawful and unfair business practices in violation of California's Unfair Competition Law ("CUCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* The CUCL allows "plaintiffs to bring claims for unfair, unlawful, or fraudulent business practices." *Gutierrez v. Wells Fargo Bank, NA*, 704 F.3d 712, 717 (9th Cir. 2012). Sensata contends that Islas' CUCL claim must be dismissed because he has not suffered a cognizable injury under that law.

To state a claim under the CUCL, a plaintiff must have "suffered injury in fact and [have] lost money or property as result of the unfair competition." Cal. Bus. & Prof. Code § 17204. The California Supreme Court has explained that because this provision requires that plaintiffs have suffered an "economic injury," it "renders standing under [the CUCL] substantially narrower than federal standing under" Article III of the U.S. Constitution. *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 323-24 (2011) (economic injury is but one among many types of injury in fact sufficient for Article III standing). Still, even though "the economic injury requirement is qualitatively more restrictive than federal injury in fact," the CUCL is not "intended to be quantitatively more difficult to satisfy." *Id.* at 324. Put differently, "the quantum of lost money or property necessary to show standing [under the CUCL] is only so much as would suffice to establish injury in fact" under

Article III. *Id.* Accordingly, all that is required is "some specific, identifiable trifle" of economic injury. *Id.* (quotation marks omitted).

Islas has adequately alleged an economic injury sufficient to establish standing under the CUCL. As discussed, the consolidated complaint asserts that the plaintiffs have spent and will spend significant time mitigating the risks of the Data Breach that could have otherwise been spent working. "The loss of this time is equivalent to a monetary injury, which is indisputably a concrete injury" for the purposes of Article III. *Webb*, 72 F.4th at 376.[9] Accordingly, Islas' CUCL claim will not be dismissed for failure to plead a cognizable injury. *See Kwikset*, 51 Cal. 4th at 343 ("Neither the text of [the proposition enacting the CUCL] nor the ballot arguments in support of it purport to define or limit the concept of 'lost money or property,' nor can or need we supply an exhaustive list of the ways in which unfair competition may cause economic harm.").

Sensata next asserts that Islas' CUCL claim must be dismissed because the consolidated complaint fails to allege any unfair, unlawful, or fraudulent business practices. "The California Supreme Court has held that [S]ection 17200 'defines unfair competition very broadly, to include anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Chabner v. United of Omaha Life Ins. Co.*, 225 F.3d 1042, 1048 (9th Cir. 2000) (quoting

[9] Sensata does not dispute that Islas' already-expended lost time satisfies the CUCL. Rather, it appears to contest Islas' allegations of *future* monetary damages—i.e., future lost time responding to the Data Breach and $200 future annual payments for ongoing credit and identity theft monitoring. Sensata contends that the CUCL requires that economic injuries have *already* occurred, and it asserts that "intangible allegations of future cost" do not demonstrate that a plaintiff *has* lost money or property. *See In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-md-02752-LHK, 2017 WL 3727318, at *22 (N.D. Cal. Aug. 30, 2017) (quotation marks omitted); *but see Mier v. CVS Pharmacy, Inc.*, 2021 WL 1559367, at *13 (C.D. Cal. Mar. 22, 2021) (a plaintiff "may seek equitable relief under [the CUCL] to the extent that his claims are premised on alleged future harm"), *rev'd in part on reconsideration on other grounds*, 2023 WL 6985706 (Oct. 20, 2023). In any event, the Court need not resolve this issue because Islas has adequately alleged that he has *already* suffered economic harm in the form of lost time.

*Farmers Ins. Exch. v. Superior Ct.*, 2 Cal. 4th 377, 395 (1992)). "By proscribing any unlawful business practice, [S]ection 17200 borrows violations of other laws and treats them as unlawful practices that the unfair competition law makes independently actionable." *Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 180 (1999) (quotation marks omitted). "However, the law does more than just borrow. The statutory language referring to 'any unlawful, unfair *or* fraudulent' practice . . . makes clear that a practice may be deemed unfair even if not specifically proscribed by some other law." *Id.*

As Sensata sees it, Islas' CUCL claim must be dismissed because he has failed to specifically allege how Sensata violated the other statutes and common law duties at issue in this case, what made Sensata's security measures unreasonable, or what facts led Islas to believe that Sensata did not comply with industry standards. That argument is unavailing. For the same reasons that Islas sufficiently pled a violation of the CCPA, the consolidated complaint adequately describes Sensata's unlawful conduct for purposes of a CUCL claim. Moreover, a violation of the CCPA or CCRA, or a breach of contract, each alone is "sufficient to serve as the 'predicate for stating a cause of action under the [CUCL's] unlawful prong.'" *CardStarter, Ltd. v. SundaeSwap, Inc.*, No. 22-cv-757-RS, 2022 WL 5221497, at *5 (N.D. Cal. Oct. 5, 2022) (quoting *Berryman v. Merit Pro. Mgmt., Inc.*, 62 Cal. Rptr. 3d 177, 185 (Ct. App. 2007)); *see Keilholtz v. Lennox Hearth Prods. Inc.*, 268 F.R.D. 330, 342 (N.D. Cal. 2010) ("Violation of almost any federal, state, or local law may serve as the basis for a [CUCL] claim."). Accordingly, Islas' CUCL claim survives dismissal.[10]

[10] Having concluded that Islas adequately alleged unlawful acts by Sensata, the Court will not address whether the consolidated complaint sufficiently alleges an unfair business practice. *See* Cal. Bus. & Prof. Code § 17200 (prohibiting "any unlawful, unfair *or* fraudulent business act or practice" (emphasis added)).

H. Massachusetts Consumer Protection Act and Declaratory Judgment Act Claims.

In Count VII, the plaintiffs assert a claim under Massachusetts' Consumer Protection Act, M.G.L. c. 93A. Sensata contends, and the Court agrees, that this claim must be dismissed because all six plaintiffs are former employees of Sensata, and Chapter 93A does not apply to claims made by an employee against an employer arising out of the employment relationship. *See, e.g.*, *Debnam v. FedEx Home Delivery*, 766 F.3d 93, 96-97 (1st Cir. 2014) ("[A]n employee cannot bring a suit against his or her employer under Chapter 93A."); *Anzalone v. Mass. Bay Transp. Auth.*, 403 Mass. 119, 121-22 (1988) (Chapter 93A does not apply to suit between former employee and former employer in a dispute arising out of the employment relationship). The plaintiffs do not meaningfully dispute that their status as former employees of Sensata forecloses their Chapter 93A claim. Accordingly, Count VII will be dismissed.

Count VIII seeks a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* Because a declaratory judgment is "not a cause of action," but a form of relief, the plaintiffs' standalone claim for declaratory relief must be dismissed. *Buck v. Am. Airlines, Inc.*, 476 F.3d 29, 33 n.3 (1st Cir. 2007). That dismissal will not, however, affect the plaintiffs' ability to seek a declaratory judgment as relief for their other properly pled claims.

## CONCLUSIONS AND ORDERS

For the foregoing reasons, Sensata's motion to dismiss, ECF 22, is GRANTED in part and DENIED in part. Counts VII and VIII are DISMISSED, and Counts I, II, III, IV, V, and VI remain.

SO ORDERED.

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE

Dated: September 30, 2026